# Green's Appeal.

1. In this state the words "first mortgage" have a fixed, definite meaning and imply that the lien of the mortgage is prior that of any other claim.

2. When any person sells a bond, setting out on its face that it is secured by a first mortgage, or induces another to guarantee it as such, he will, in the absence of any further qualification, be estopped from subsequently setting up a lien as against the guarantor and holders of the bonds.

March 4th 1881.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Appeal from the Court of Common Pleas of *Berks county:* Of January Term 1880, No. 262.

Appeal of Robert C. Green from a decree distributing the proceeds of a sheriff's sale of certain real estate, the property of the East Penn Iron Company.    The facts of the case, as they were found by the auditor (Frank R. Schell, Esq.), from the evidence adduced before him, were as follows:

On April 15th 1874, John E. Noble entered into a written agreement to build for the East Penn Iron Co., upon the land of the company, two anthracite coal furnaces.    The company agreed to pay him, in all, the sum of $180,000; $30,000 in current funds, $85,000 in first mortgage bonds of the company, to be guaranteed by the Philadelphia and Reading Railroad Company, and $65,000 in stock of the East Penn Iron Co.    The payments were to be made every month before the fifteenth day thereof, subject to monthly returns of the engineer and superintendent of the company.    Ten per cent. of the contract sum was to be retained until the furnaces were complete.

On May 19th 1874, Noble broke ground and set about the construction of the furnaces, but as the work went on, the East Penn Iron Co. failed to make the payments to Noble in accordance with their agreement. Noble was, accordingly, unable to pay his subcontractors, and on November 21st 1874, one firm of said sub-contractors, McIntosh, Hemphill & Co., filed a mechanic's lien against the furnaces for $17,000.

On December 30th 1874, an agreement was entered into between the East Penn Iron Co. and the Philadelphia and Reading Railroad Co., whereby the latter undertook to guarantee bonds of the former to the amount of $75,000. These bonds were to be deposited with the Safe Deposit Bank of Pottsville, and to be delivered to the East Penn Iron Co. at various stipulated intervals, as the building of the furnaces progressed. They were to be applied wholly to the erection of the furnaces. The guarantors reserved to themselves the right at any time to prohibit a further issue of the bonds.

These bonds were to be secured by a first mortgage on the real estate of the East Penn Iron Co., to be executed to said Safe Deposit Bank as trustee for the various bondholders. On the same day, the bonds and mortgage were executed, the latter being recorded February 1st 1875. Each bond was headed and endorsed "FIRST-MORTGAGE BOND."

On February 2d 1875, $25,000 of bonds were issued to Noble, and on February 9th 1875, $23,000 more, making in all $48,000, with the understanding that Noble was to use them, inter alia, for the discharge of the McIntosh, Hemphill & Co.'s lien. All the bonds thus issued to Noble he negotiated and transferred for value, paying $6000 of them to McIntosh, Hemphill & Co., on account of their mechanic's lien, and selling the remaining $42,000 to brokers in Philadelphia. He subsequently paid off the McIntosh, Hemphill & Co.'s lien so as to reduce it to $2070.55.

The remaining $27,000 of bonds in the custody of the Safe Deposit Bank of Pottsville were never issued, the Philadelphia and Reading Railroad Company forbidding the issue of them on the ground that the East Penn Iron Company and Noble had failed to remove all the liens against the company from the record.

Noble meantime steadily continued the building of the furnaces, the East Penn Iron Company being constantly in arrear in their payments to him. In July 1875, the furnaces were complete. Noble now made application to the company for the full amount due him, but payment was refused.

Sub-contractors' liens to the amount of $8441.71 had already been or were before the following November filed, including the balance still due to McIntosh, Hemphill & Co. On November 3d 1875, Noble himself filed a lien for $51,953.03, the balance he alleged to be still due to him on his contract. On April 11th

[Green's Appeal.]

1876, Noble assigned this claim to R. C. Green. On November 11th 1876, the East Penn Iron Company confessed judgment upon this claim to the extent of $35,000, which judgment was subsequently opened on application of the Philadelphia and Reading Railroad Company. One Miller afterwards obtained judgment against the East Penn Iron Company, and issued a writ of *vend. ex.* against the furnaces, which were exposed to sheriff's sale and sold on June 9th 1877, for $55,000, which sum was paid into court and was the amount before the auditor for distribution.

It was admitted that the liens of the sub-contractors and certain labor claims, amounting to $311.65, were entitled to payment in full. out of the fund. The residue was claimed (1) by Green as assignee of Noble's mechanic's lien, (2) by the holders of the bonds secured by the mortgage upon the furnaces, on the ground that Noble was estopped from filing any mechanic's lien to take precedence of the mortgage of December 30th 1874—(a) Because of his contract with the East Penn Iron Company, whereby he agreed to accept these bonds from the trustees in the mortgage as *first mortgage* bonds; (b) Because in negotiating said bonds he declared them to be bonds secured by a first lien upon the mortgaged premises, and therefore could not set up a superior lien in himself.

The auditor, being of opinion that there was no such estoppel, awarded from the fund, after payment of costs and legal expenses, as follows:

1. The full amount of the sub-contractor's liens and labor claims.

2. $34,172.44, the amount he found to be still due on Noble's claim, to Green.

3. The residue of the fund pro rata to the bondholders.

To this report Green filed exceptions, on the ground that the auditor had erred as to the amount due upon his claim. The bondholders also filed exceptions, on the ground, inter alia, that they had been improperly postponed to Noble's claim. The court, HAGENMAN, P. J., (SASSAMAN, J., did not sit, having been of counsel in the cause), overruled Green's exceptions and sustained those of the bondholders, and a decree was accordingly entered awarding from the fund, first, the amount of the sub-contractor's liens and of the labor claims in full; and second, distributing the balance of the fund pro rata among the bondholders. From this decree R. C. Green appealed, assigning for error, inter alia, the postponing of his lien to the bondholders, and the failure to award him the full amount of his lien.

*G. R. Kaercher* and *James Ryon* (with whom were *James M. Healy, Horace Roland, S. H. Kaercher* and *F. W. Hughes*), for appellant.—The amount really remaining due upon the lien filed by Noble was $47,600. The facts of the case will not warrant the application of the doctrine of estoppel. The doctrine is not

[Green's Appeal.]

favored: Waters's Appeal, 11 Casey 527. Every estoppel must be proved by facts positive or circumstantial: Commonwealth v. Moltz, 10 Barr 533; Sunderland v. Struthers, 11 Wright 422; Rhodes v. Childs, 14 P. F. Smith 25. Noble's right to file a lien being statutory, can only be taken away by clear evidence of the relinquishment on his part of the right: Miranville v. Silverthorn, 12 Wright 150; Washabaugh v. Entriken, 12 Casey 513. The mere acceptance of the bonds by him as part payment on his contract, cannot preclude his right to file a lien for the balance due him. Nor can the bondholders take advantage of this fact as a ground of estoppel. The Philadelphia & Reading Railroad Company, guarantors, withheld $27,000 of the bonds. They must show performance of their full contract of guarantee before an estoppel can be invoked which will operate in their favor so far as partly to exempt them from liability on their contract of guarantee. Nor can the negotiating of the bonds by Noble be deemed to estop him from claiming priority on his mechanic's lien. He made no misrepresentations whereby purchasers were deceived. His silence cannot be construed into an estoppel: Knouff v. Thompson, 4 Harris 361; Hill v. Epley, 7 Casey 334. The endorsement and heading "First Mortgage Bonds," was a declaration of the company and not of Noble. It had reference to the facts existing at the date of the bonds, and was therefore true, even if intended to mean "first lien," with reference to claims that might be thereafter filed. Purchasers were bound to take notice of the condition of the real estate, and its liability to subsequent mechanics' liens: Crest v. Jack, 3 Watts 240; Hepburn v. McDowell, 17 S. & R. 383. Besides "first mortgage," it must be remembered, does not mean "first lien" in any sense. In every view, Noble's lien is clearly entitled to priority: Mott v. Clark, 9 Barr 399; Hendrickson's Appeal, 12 Harris 363; Wethrill's Appeal, 3 Grant Cas. 281; Taylor v. Gitt, 10 Barr 428; Fisher v. Knox, 1 Harris 623.

*G. F. Baer*, for appellees.—The amount awarded by the auditor to Green was as much as he is entitled to in any view of the case. The words "first mortgage" are synonymous in our State with "first lien." That this was the understanding of the guarantors in this case is shown by their demand that the lien already upon the property at the time of the execution of the bonds and mortgages should be discharged out of the proceeds thereof. In this understanding Noble acquiesced. The negotiation then of the bonds by Noble to third parties must be deemed as a waiver on his part of any claim of priority for his mechanic's claim. The case is fully within the requisites of an estoppel: McCully v. Pittsburgh & Connellsville Railroad Co., 8 Casey 32; Guiterman v. Landis, 1 W. N. C. 622; Cornish v. Abington, 4 H. & N. 556;

[Green's Appeal.]

Carr *v.* Lond. & N. W. Railroad Co., 10 L. R., C. P. 317; Phil-
hower *v.* Todd, 11 N. J. Eq. 312; Covert *v.* Irwin, 3 S. & R. 283;
Keeler *v.* Vantuyle, 6 Barr 250; Maple *v.* Kussart, 3 P. F. Smith
348; Workman *v.* Guthrie, 5 Casey 495; Carr *v.* Wallace, 7
Watts 394; Dean *v.* Connelly, 6 Barr 239; Brown *v.* McCormick,
6 Watts 60; Colder *v.* Chapman, 2 P. F. Smith 360; Clark *v.*
Martin, 13 Wright 303; Ackla *v.* Ackla, 6 Barr 228; McElrath
*v.* Pittsburgh & Steubenville Railroad Co., 5 P. F. Smith 189;
Gregg *v.* Wells, 10 A. & E. 90.

Mr. Justice TRUNKEY delivered the opinion of the court, March
28th 1881.

After the completion of the furnaces, Noble filed a claim under
the Mechanics' Lien Law for $51,953.03. The auditor found the
balance due him was $34,172.44. His counsel alleges that the
auditor erred in stating the sum due less than it should be, and
that the true balance is $47,600. This is less than the amount of
bonds Noble received, and the fund for distribution is not sufficient
to cover those bonds after deducting liens of sub-contractors. Then
if Noble's lien is not entitled to priority over the mortgage, it is
useless to consider the alleged errors by which his claim was
reduced.

Noble agreed to construct the furnaces for the consideration of
$180,000, to be paid by the East Penn Iron Company, $65,000 in
its stock, $30,000 in current funds, and "eighty-five thousand
dollars of first mortgage bonds of said company, principal and
interest guaranteed by the Philadelphia and Reading Railroad
Company." Subsequently, the East Penn Iron Company and the
Philadelphia and Reading Railroad Company made an agreement,
reciting that the former had made one hundred and fifty coupon
bonds for five hundred dollars each, and a first mortgage upon
their property therein mentioned, to secure the payment thereof,
and the latter guaranteed the payment of said coupons and bonds
on certain conditions, among which were that the trustee should
hold the bonds clear of any control of the East Penn Iron Com-
pany, which should not be entitled to receive them until authorized
by the guarantor upon its becoming satisfied with the progress of
the construction of said furnaces. Noble was not a party to the
agreement between the companies. His contract contains nothing
of conditions of guaranty. Before any bonds were authorized to
be delivered to the East Penn Iron Company, a mechanic's lien
was filed, and Noble arranged to pay that lien because of the
guarantor's refusal to deliver the bonds while the same remained
unsatisfied. From this he knew that the guarantor insisted upon
the mortgage remaining what it purported to be by both agree-
ments. And with this knowledge he received all the guaranteed
bonds, which were delivered to the East Penn Iron Company—

$48,000; nor did he then assert in any way the right of priority in lien.

That Noble could file his claim and hold his lien as against the East Penn Iron Company has not been disputed, but the appellees contend that he is estopped from priority over the mortgage. The appellant denies that Noble either agreed with or represented to any one that the mortgage should have preference to his lien. Conceding, for the present inquiry, that his contract did not preclude the lien, then it dated from the commencement of the work, and was continued by filing the claim within six months after its completion. He bound himself to take less than half the contract price in first mortgage bonds to be guaranteed by a third party. What would the security to the guarantor be worth with a prior lien for the remainder of the price? Each bond bore on its face the words "First-Mortgage Bond," and also the guaranty. Every one that Noble received he sold for just what it purported to be. The guarantor could well infer his agreement to postpone his mechanic's lien, and the buyer would naturally believe he had done so. If he had a mental reservation to hold his lien against the guarantor and purchasers of the bonds, fortunately the law deals with expressions and acts of parties, rather than their secret intentions.

The Act of April 6th 1830 provides that, when the lien of a mortgage upon real estate shall be prior to all other liens upon the same, the lien of such mortgage shall not be destroyed or affected by sale of the real estate by virtue of any writ of *venditioni exponas*. That any one who contracts for a first mortgage, or who deals in first-mortgage bonds, does not know the phrase means the mortgage described in that statute, is incredible. This mortgage has long been esteemed the safest and most valuable of all real-estate securities for investments. The holder is not compelled to be ever watchful lest a subsequent creditor may sell at judicial sale and buy the property at a price that saves his debt at the loss of prior lien-creditors. In the business of half a century, a first mortgage has come to be very well understood to be one prior to all other liens. That is the kind of mortgage which was guaranteed, and the bonds thereby secured Noble received on his contract. The learned judge of the Common Pleas well said, " When the parties covenanted for a first mortgage, it implied a first lien as clearly as if words to that effect had been inserted in the agreement itself. In the plain, ordinary and popular sense, first mortgage means first lien. When railroad bonds are sold in the open market as first-mortgage bonds all persons understand them to be first liens. When we speak of lending money on first mortgage, no thought of anything but a first lien is entertained."

This meaning of first mortgage is so thoroughly grounded as to lead to the sequence that a second mortgage is understood to be

one without intervening liens between it and the first: Rice's Appeal, 29 P. F. Smith 168.   There, Ahl had a covenant for certain bonds.   The able master said, " The contract was that he should have $80,000 in second-mortgage bonds, which meant that there was to be no intervening encumbrance, and the confessing of the two judgments and then tendering to him the second-mortgage bonds was not a compliance with the contract."   AGNEW, C. J., characterized the act of placing on the property an intervening encumbrance as a breach of good faith; and PAXSON, J., said, " The bonds offered were not such a security as under his agreement he was entitled to receive."

Appellant's counsel urge that the endorsement " First-Mortgage Bonds" is an assertion of the East Penn Iron Company, and not Noble's.   Yet, first of all, Noble covenanted for such bonds.   Is it possible that when he sold them he made no assertion?   He sold them as they appeared.   At their date Noble's lien existed, and filing the claim only had the effect to continue it.   The bonds gave notice of the mortgage, and he held out the declaration " First-Mortgage Bonds."   For such he contracted, as such they were guaranteed, and as such the holders bought them.   The court is not simply called on to say whether " mortgage" and " lien" are synonymous.   The question is not one of synonyms, nor of technical definitions of words as found in dictionaries.   But what does a written contract made in Pennsylvania respecting securities on real estate mean?   When it calls for a first mortgage it means one prior to all other liens.   When a party gives such mortgage, or sells a bond secured thereby, showing the facts on its face, or when he induces its guarantee as such, unless there be some qualifications expressed, he shall not afterwards set up a lien against the guarantor and holders of the bonds.   His plainly-implied contract stands in his way.

Green stands in Noble's shoes.   There is not a scintilla of evidence to give him a better position than his assignor would have had no assignment been made.

Decree affirmed, and appeal dismissed, at the costs of the appellant.